**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL ANDREW HEWITT,** | ) | **CASE NO. 5:16CV3019** |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **JUDGE SARA LIOI** |
| **v.** | ) | |
| | ) | **MAGISTRATE JUDGE** |
| **CHARMAINE BRACY,** | ) | **JONATHAN D. GREENBERG** |
| **Warden** | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| **Respondent.** | ) | **(Doc. Nos. 1, 5, 6.)** |

This matter is before the undersigned pursuant to Local Rule 72.2.  Before the Court is the Petition of Michael Andrew Hewitt ("Hewitt" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254.  Hewitt is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the case *State of Hewitt*, Stark County Court of Common Pleas Case No. 2013-CR-1402.  For the following reasons, the undersigned recommends the Petition be DENIED.

### I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695

F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The

state appellate court summarized the facts underlying Hewitt's conviction as follows:

{¶ 2} This case arises from the murder of William Johnson in the parking lot of a Canton mosque on August 31, 2013. The following is adduced from the trial record.

*August 30, 2013: Appellant Damages a Car*

{¶ 3} In August 2013, appellant lived at 820 Milton Court NW, Canton, with roommate Jeremy Laird, Laird's girlfriend, and their two children. Next door, at 822 Milton Court NW, lived roommates Cortney Jackson ("Cortney") and William Johnson ("Johnson"), known as "Pie," along with two other roommates and their children. The residents of both homes were friendly with each other. Appellant was briefly involved in a relationship with Cortney.

{¶ 4} On Friday, August 30, 2013, Cortney and Laird got into an argument over money and Laird drew appellant into the argument. Cortney recently brought home a new car and in the course of this argument, appellant jumped onto the roof of the car and "stomped" on it, running up and down the length of the car and attempting to kick off the side mirrors.

{¶ 5} Laird testified Johnson remained inside the house during the argument and car-stomping. Cortney testified that Johnson witnessed the episode along with all of her roommates but did not get involved, stating only "Dude, that's not cool, why are you doing that?"

{¶ 6} Cortney called the police and made a report for criminal damaging. She testified appellant left the scene before the police arrived, driving off on a "mini bike."

*August 30 and August 31, 2013: Appellant's Movements via Text Messages*

{¶ 7} Admitted without objection was State's Exhibit 7, a disk containing hard copies of all of the data extracted from appellant's cell phone, including text messages, videos, web histories, etc. A detective also read from State's Exhibit 20, a printed-out hard copy of appellant's texts sent and received in the aftermath of the car-stomping episode on August 30. (Appellant still has a California number and cell phone service; thus the time of the texts is not Eastern Standard Time.) The following evidence is adduced from the text messages read at trial.

{¶ 8} On August 30, 2013, after the criminal damaging incident, appellant skipped work. He texts his boss, Dina Tozzi, to tell her he has "some issues" going on and

2

as a result he will be unable to come to work and he apologizes for "letting her down on a Friday."

{¶ 9} Appellant tells his brother D.H., [Footnote 1: Appellant's brother D.H. is a minor and was subpoenaed by appellee.] among others, that Cortney called the police because he stomped on her car. In response to D.H., appellant texts "Yep ... drama. I did it in front of pie and britt. Pie didn wanna get involved Britt jus yelled to get down. I guess after I smashed off pie wanted to talk shit n they all sayin they getn some Chicago niggas on me lol." (Sic throughout). In response to someone asking what he did to the car, appellant responds, "Lmao ya got on her shit for hella long y they all watched They talkin bout having Chicago niggas come blaze me lol. Talk talk talk I hada show em wassup." (Sic throughout). Later, appellant asks D.H. if he can spend the night at the home of D.H. and their father: " * * * * I'm layin low cause Jeremy doesn't want funk over there. I might come stay with yal if dad aient trippn." (Sic throughout).

{¶ 10} Someone named "Scandra" asks, "U think she's gonna snitch? Or u only have to worry about Chicago niggas lol." Appellant responds in two separate texts. First, "She already had the cops come I guess they took a lil report n bounced I'm still layin low for the weekend have some fun see what happens;" and, "I got somewhere to stay n I got my heat."

{¶ 11} Appellant worked on August 31, 2013 and left between 8:10 and 8:15 p.m. At 8:23 p.m. Eastern Time on August 31, appellant texts D.H. and states, "I'm walk-in home now." One minute later, D.H. texts, "Hit up worm he's bout to go to Walmart soon?" and at 8:41 p.m. from 330–546–5324 (an unidentified caller), "J?" The last two texts are "unread" and the text history stops there.

*The Evidence Corresponds to the Texts: August 31, 2013*

{¶ 12} Appellant went to work at Tozzi's Downtown on the evening of Saturday, August 31, 2013. He arrived at 5:00 p.m. At 7:45 p.m., his boss gave him the option of leaving and testified appellant left somewhere around 8:10 to 8:15 p.m. She said appellant usually brought a backpack to work with him but she didn't think he had it that night. When she last saw appellant, he was wearing black or dark grey pants that ended just below the knee, black boots, and a white button-down shirt with a blue pinstripe.

*L.M. Witnesses a Fight and a Murder*

{¶ 13} Sometime after 8:00 p.m., a female neighbor, L.M., called 911 to report two men were fighting in the parking lot of a mosque located near the corner of 7th and Brown Streets N.W., Canton. L.M. testified the fight began on the corner and moved into the parking lot, under a tree. She saw one man lift his shirt up and flash a gun,

which he then tried to get out of his pants. L.M. laid on the floor, still talking to the 911 operator, and heard two shots fired. She looked out again and saw one man, alone, lying in the parking lot under the tree. The man on the ground was black.

{¶ 14} L.M. described the men fighting as a white man and a black man. At trial, she said "I thought [the shooter] was white then," explaining she learned from news reports the suspect was biracial. She said the "brighter-skinned" guy was the one with the gun. He had curly light-brown hair to his shoulders and was wearing a white "button-up" shirt. The gun she saw was silver or gray but not black because she recalled it was "bright."

{¶ 15} L.M.'s 911 call was played at trial as State's Exhibit 1.

*E.F. Sees a Young Man Run Away*

{¶ 16} A male neighbor, E.F., was on his porch on Brown Street when he heard what he thought were fireworks coming from the area of the mosque. He observed a young man with light skin and dark brown hair running very fast from the direction of the mosque, heading west on 7th Street on the other side of the road from E.F. He said the young man wore a loose-fitting tank top and shorts.

{¶ 17} E.F. walked toward the mosque and saw a man laying on the ground. He ran up to the man and saw he had been shot in the face. E.F. called 911 and the dispatcher said they were already aware of the shooting. Police arrived on the scene moments later. E .F. told police the man ran toward McGregor Street, "into darkness" because the street is not lit.

{¶ 18} While police worked at the crime scene in the mosque parking lot, E.F. saw what he believed to be the same young man walk up toward the scene several times and then retreat. The young man then entered some shrubs and trees by a wood-processing factory and E.F. heard a "lawnmower" start up. The young man came out from the shrubbery on what E.F. described as a "homemade moped" which made the lawnmower noise.

{¶ 19} E.F. described the young man as having straight hair, wearing a hat, and with a scraggly beard. He was not asked to look at a photo lineup because he told police he would not recognize the man again. At trial, E.F. identified appellant as the young man he saw the night of the murder, although he acknowledged he looked "different" than he did that night. On cross examination, E.F. was shown a photograph of appellant taken very soon after the murder and agreed appellant has curly hair in the photo, thus appellant was not the person he saw. (T. 479–480).

*Police Quickly Arrive on the Scene and Find a Cell Phone*

4

{¶ 20} Police were at the mosque within approximately three minutes of the 911 calls reporting shots fired. Detective Weirich of the Canton Police Department I.D. Bureau was on the scene collecting evidence when he observed a cell phone in the middle of the parking lot playing music. Weirich testified the phone was face-down and playing music continuously; he picked it up, turned it over, and read the screen saver: "Michael Hewitt." Police also collected a black t-shirt from the roadway.

{¶ 21} Witnesses including L.M. and E.F. came forward and reported what they saw.

{¶ 22} Weirich reported the name on the cell phone to Detective Prince, who looked up the name in Canton Police databases and discovered a "Michael Hewitt" who lived at 1222 Ford N.W., Canton, but did not match the description of the suspect. Prince learned Michael Hewitt Sr. had a son with the same name, appellant, who was named in an incident report from the previous day: the criminal damaging to Cortney's car.

{¶ 23} Prince learned appellant lived next door to Cortney at 820 Milton N.W. with Jeremy Laird, who drove a green minivan. Police immediately went to appellant's address and observed the green minivan, driven by Laird, appear a few minutes later. Prince testified Laird was "acting peculiar" and going in and out of the house. Police approached to make contact with Laird. As they did so, they noticed a commotion from next door at 822 Milton N.W., as occupants learned Johnson had been shot and killed. Police told Laird they were looking for appellant and Laird said he had just dropped appellant off around the corner on 7th Street N.W.

{¶ 24} Police thought appellant might have gone to his father's house at 1222 Ford Court N.W. and eventually found him there. Appellant was brought in to the Canton Police Department around 1:20 a.m. in the morning.

*The Search Warrants: Firearms Found, but not the Murder Weapon*

{¶ 25} In the meantime, Laird gave police permission to search the residence and they obtained a search warrant for the basement area where appellant lived. Police discovered and photographed a number of firearms throughout the residence. A search warrant was also obtained for appellant's father's residence at 1222 Ford Court N.W. Police photographed several firearms and where they were found.

{¶ 26} Police suspected a revolver was used in the murder because no shell casings were discovered at the scene and a revolver, when fired, does not spit out a shell casing; casings must be manually ejected. No revolvers were recovered from either house. At trial, a criminalist from the Stark County Crime Lab testified that he tested six firearms recovered in this case for operability; all were operable but none were revolvers and none were involved in the murder. Thus, the criminalist concluded, because no shell casings were recovered, the scene was pristine, and there was no

time for the shooter to pick up any shell casings, the murder weapon was most likely a revolver. The murder weapon was never found.

{¶ 27} The criminalist examined pieces of jacketed hollow-point bullets recovered from the autopsy of the victim. Both came from the same firearm, likely a .38 special caliber firearm manufactured by Smith and Wesson or SportsArms or a .357 magnum revolver manufactured by Smith and Wesson, Ruger, or Taurus. No such weapon was located. The criminalist was shown State's Ex. 8–C, a photograph of several firearms taken from appellant's cell phone. The criminalist testified he could not determine whether the gun in the photo fired the bullets without actually having the gun to examine.

*Appellant's Actions upon Arrest*

{¶ 28} Appellant was arrested for the criminal damaging offense from the day before and brought into an interview room at the Canton Police Department in handcuffs. Sgt. Prince told appellant he would be obtaining a search warrant for a D.N.A. standard from appellant and also for a gunshot residue test (G.S.R.). Upon learning of the impending G.S.R. test, appellant wiped his hand on the hospital gown he was wearing.

{¶ 29} Prince advised appellant of his Miranda rights; appellant requested counsel and declined to make a statement.

{¶ 30} Police photographed appellant and observed scratches to his trunk and face, redness on his face, and injuries to his hands. The D.N.A. standard was also obtained. [Footnote 2: The record is devoid of any mention of whether a G.S.R. test was performed on appellant and any result.]

*D.N.A. Evidence Ties Appellant to Johnson and the Scene*

{¶ 31} Victim William "Pie" Johnson received two separate shotgun wounds with two entrance wounds and no exit wounds: one to his right thigh and one to the left side of his head. The coroner observed stippling to the head wound indicating the firearm was approximately two and a half to four inches away when it was fired. The coroner did not observe any other signs of injury to Johnson.

{¶ 32} A forensic scientist from B.C.I. analyzed the D.N.A. evidence in the case. Appellant's D.N.A. was found on the inside collar of the black t-shirt collected from the scene. She found D.N.A. consistent with appellant and Johnson under Johnson's right fingernails. D.N.A. under Johnson's left fingernails contained a mixture from Johnson and another unknown individual.

*Laird's Account of Appellant's Movements on August 31, 2013*

6

{¶ 33} Laird testified as a witness for appellee. He said he saw appellant before work that night and then again between 11:30 p.m. and midnight; appellant wore no shirt, black work shorts, no shoes, and tube socks. They planned to return to their house to "smoke weed" and drove together in Laird's green minivan. Laird testified that he and appellant were driving home when appellant mentioned he lost his cell phone on 7th Street. He didn't say how he lost the phone but he and Laird cursorily looked for it from the windows of the van. Laird dropped appellant off a short distance from the house to avoid "drama" with the neighbors and was then intercepted by police.

{¶ 34} Laird testified that the firearms found at 820 Milton were appellant's, not his, and that appellant usually kept them in his bedroom but lately had them scattered throughout the house for "protection." Laird agreed that appellant sometimes carried a firearm with him in a green bag. Laird was asked about a green drawstring bag that was found in his minivan; Laird said appellant had not been carrying the bag that night and the bag was not found to contain a firearm. Laird testified appellant was not agitated and had no blood on him. Laird also confirmed that appellant intended to stay at his father's residence for the time being due to the trouble with the neighbors.

*State v. Hewitt*, 2015 WL 2194185 at * 1- 5 (Ohio App. 5th Dist. May 4, 2015).

## II. Procedural History

### A.     Trial Court Proceedings

In October 2013, a Stark County Grand Jury charged Hewitt with (1) one count of murder in violation of Ohio Rev. Code § 2903.02(B)[1] with a firearm specification; and (2) one count of felonious assault in violation of Ohio Rev. Code § 2903.11(A)(2).  (Doc. No. 5-1 at Exh. 1.) Hewitt pled not guilty.  (Doc. No. 5-1 at Exh. 33.)

---

[1] Specifically, the indictment charged as follows: "That Michael Andrew Hewitt late of said County on or about the 31st day of August in the year of our Lord two thousand and thirteen, at the County of Stark, aforesaid, did **knowingly** cause the death of William Johnson as a proximate result of the said Michael Andrew Hewitt committing or attempting to commit Felonious Assault [R.C. 2903.11(A)(2)] an offense of violence that was a felony of the first or second degree and that was not a violation of Section 2903.03 or 2903.04 of the Revised Code, to-wit: Did, **knowingly**, cause or attempt to cause physical harm to William Johnson, by means of a deadly weapon or dangerous ordnance, to-wit a Firearm, in violation of Section 2903.02(B) of the Ohio Revised Code." (Doc. No. 5-1 at Exh. 1) (emphasis added).

7

The record reflects Hewitt filed several pre-trial motions.  On November 15, 2013, Hewitt filed a "Motion to Suppress/Motion in Limine," in which he asked the trial court to "suppress the use of any statements, including gestures, made during his questioning by police." (Doc. No. 5-1 at Exh. 2.)  On that same date, he also filed a Motion in Limine to exclude "certain evidence regarding prior bad acts," i.e., evidence regarding the criminal damaging incident involving Ms. Jackson's car.  (Doc. No. 5-1 at Exh. 3.)  Hewitt also filed a Motion to Suppress "any evidence obtained from his cell phone."  (Doc. No. 5-1 at Exh. 8.)  Several days later, on November 27, 2013, Hewitt filed a Motion to Suppress the pre-trial identification of him by witness Charles Currence.  (Doc. No. 5-1 at Exh. 5.)

The trial court conducted a hearing on Hewitt's motions on December 30, 2013.  (Doc. No. 9-2.)  With regard to Hewitt's motion to suppress evidence of gestures made while in police custody, the trial court heard testimony from Detective Scott Prince.  (*Id*. at Tr. 22-30.) Detective Prince testified Hewitt was arrested on charges of criminal damaging, handcuffed, and brought to the Canton Police Department.  (*Id*.)  Before reading Hewitt his *Miranda* rights, Detective Prince advised him they were preparing a warrant to obtain his DNA and perform a gunshot residue ("G.S.R") test.  (*Id*.)  Detective Prince testified that, immediately after hearing this, Hewitt wiped his hand on his clothing.  (*Id*.)  Detective Prince then proceeded to read Hewitt his *Miranda* rights.  (*Id*.)  After hearing argument from counsel, the state trial court overruled Hewitt's motion to suppress, finding as follows:

> All right. Okay. Well, as a preliminary matter, the Court finds that the Defendant's gesture, whatever it might have been was not in response to questioning of the Defendant.  It was based on a reaction to possibly the statements made by the officer, but that it was not a violation since the questioning had not started.
>
> Now, I will say to you this.  That I will be seeing the video, and I will want to see

8

that outside the presence of the jury and in conjunction with the statements attributed to the officer.  But based on what has been presented to me in this courtroom, I am not finding it to be improper questioning without *Miranda* warnings having been given.

It often happens that somebody blurts out something or says something in response to circumstances, not in response to a question or being interrogated; and that is not a violation.

But I am going to look further at it.  But based on what I have been presented today, I see no violation; and the motion will be overruled.  All right.

(*Id*. at Tr. 30-31.)

The trial court also overruled Hewitt's motion to suppress evidence regarding the criminal damaging charge; i.e., evidence that he stomped on Ms. Jackson's car the day before the shooting.  (*Id*. at Tr. 17.)  In so ruling, the trial court rejected Hewitt's argument that evidence regarding the criminal damaging incident should be excluded because that incident was totally unrelated to the shooting.  The court explained:

All right.  Well, clearly it appears that there are incidents that are related that could well give rise to motive, could give rise to identification based on the incident that occurred with the damaging of a vehicle and what transpired thereafter.  So the Court is going to overrule the motion in limine.

(*Id*.)  The court did, however, state that it would reserve ruling as to whether a limiting instruction would be warranted at trial.[2]  (*Id*. at Tr. 18.)

On January 24, 2014, Hewitt filed a Motion in Limine to exclude "any pictures of any weapons and/or drug paraphernalia found on the Defendant's phone in this matter." (Doc. No. 5-1 at Exh. 9.)  Therein, Hewitt argued as follows:

---

[2]  The trial court reserved ruling on Hewitt's motion to suppress evidence obtained from his cell phone.  (Doc. No. 9-2 at Tr. 31-34.)  Lastly, defense counsel withdrew Hewitt's motion to suppress the pre-trial identification by Mr. Currence.  (Doc. No. 9-2 at Tr. 10-12.)

9

Defendant states the State of Ohio cannot prove that any of the weapons are attached to the Defendant, let alone used by the Defendant in this matter and that any of the Defendant's alleged illegal activities or pictures of drugs have anything to do with this case.  Defendant submits that these matters are not probative of any evidentiary value and if they were, any evidentiary value would be substantially outweighed by the danger of unfair prejudice pursuant to Evidence Rule 403. On that basis of such, Defendant respectfully requests the Court to instruct the State of Ohio to not elicit any testimony regarding any pictures from the contents of the Defendant's phone that was searched in this matter.

(*Id.*)  Hewitt did not renew his objection at trial and photographs from his cell phone were introduced as evidence.  (Doc. No. 5-1 at Exh. 17, ¶¶ 46, 48.)

Jury trial commenced on February 24, 2014.  (Doc. No. 5-1 at Exh. 10.)  After "due deliberations," the jury "informed the Court that they were unable to reach a verdict and that there was no probability of such jurors agreeing upon a verdict."  (*Id.*)  The court then discharged the jury without prejudice to the prosecution and ordered the case be reassigned for trial.  (*Id.*)

On April 9, 2014, the Stark County Grand Jury issued a superseding indictment charging Hewitt with one count of murder in violation of Ohio Rev. Code § 2903.02(A),[3] along with a firearm specification.  (Doc. No. 5-1 at Exh. 11.)

Hewitt's second jury trial commenced on April 22, 2014.  (Doc. No. 5-1 at Exh. 13.)  The jury found him guilty as charged.  (Doc. No. 5-1 at Exhs 12, 13.)  On May 6, 2014, the trial court sentenced Hewitt to a prison term of 15 years to life on the murder charge and 3 years on the

---

[3]  Specifically, the indictment charged as follows: "That MICHAEL ANDREW HEWITT late of said County on or about the 31st  day of August in the year of our Lord two thousand thirteen, at the County of Stark, aforesaid, did **purposely** cause the death of William Johnson, in violation of Section 2903.02(A) of the Ohio Revised Code, contrary to the statute in such cause made and provided, and against the peace and dignity of the State of Ohio." (Doc. No. 5-1 at Exh. 11) (emphasis added).

firearm specification to be served consecutively, for an aggregate sentence of 18 years to life.

(Doc. No. 5-1 at Exh. 13.)

**B.**     **Direct Appeal**

On May 15, 2014, Hewitt, through new counsel, filed a Notice of Appeal with the Court

of Appeals for the Fifth Appellate District ("state appellate court").  (Doc. No. 5-1 at Exh. 14.)

In his appellate brief, Hewitt raised the following assignments of error:

> I.     The trial court erred in admitting photographs, the probative value of
>        which was substantially outweighed by the danger of unfair prejudice.
>
> II.    The trial court erred by admitting evidence of and argument about
>        "other acts" prohibited by Evidence Rule 404.
>
> III.   The trial court erred by not granting Appellant's motion to suppress the
>        gestures he made while in custody.
>
> IV.    The trial court's finding of guilty was against the manifest weight of the
>        evidence and was not supported by sufficient evidence.

(Doc. No. 5-1 at Exh. 15.)  The State filed a brief in response.  (Doc. No. 5-1 at Exh. 16..)

On May 4, 2015, the state appellate court affirmed Hewitt's convictions and prison

sentences.  (Doc. No. 5-1 at Exh. 17.)  *See also State v. Hewitt*, 2015 WL 2194185 (Ohio App.

5th Dist. May 4, 2015).

On September 3, 2015, Hewitt filed a *pro se* Notice of Appeal and Motion for Leave to

File Motion for Leave to file with the Supreme Court of Ohio.  (Doc. No. 5-1 at Exhs. 18, 19.)

Hewitt's Motion was granted on October 28, 2015.  (Doc. No. 5-1 at Exh. 20.)  In his

Memorandum in Support of Jurisdiction, Hewitt raised the following Propositions of Law:

> I.     The trial court erred in admitting photographs, probative value of which
>        were substantially outweighed by the danger of unfair prejudice.

11

II.     The trial court erred by admitting evidence of and argument about "other acts" prohibited by Evidence Rule 404.

III.    The trial court erred by not granting Appellant's motion to suppress the gestures he made while in custody.

IV.    The trial court finding of guilty was not against the manifest weight of the evidence and was not supported by substantial evidence.

(Doc. No. 5-1 at Exh. 21.)  The State filed a waiver of memorandum in response.  (Doc. No. 5-1 at Exh. 22.)

On January 20, 2016, the Supreme Court of Ohio declined to accept jurisdiction of the appeal pursuant to S.Ct. Prac. R. 7.08(B)(4).  (Doc. No. 5-1 at Exh. 23.)

**C.     Post-Conviction Filings**

On March 4, 2016, Hewitt filed a *pro se* "Motion for Copy or Use of Court Transcripts at the State's Expense for Preparation of Motion to Reopen" pursuant to Ohio App. R. 26(B). (Doc. No. 5-1 at Exh. 24.)  On March 16, 2016, the state trial court denied Hewitt's motion. (Doc. No. 5-1 at Exh. 25.)

Hewitt filed a Notice of Appeal on April 5, 2016.  (Doc. No. 5-1 at Exh. 26.)  In his appellate brief, Hewitt raised the following assignment of error:

I.      The trial court erred and violated the defendant-appellant's due process rights under the United States and Ohio Constitutions when it denied his motion for copy or use of court transcripts at the State's expense for preparation of an App. R. 26(B) Application for Reopening.

(Doc. No. 5-1 at Exh. 27.)  The State filed a brief in response.  (Doc. No. 5-1 at Exh. 28.)

On September 16, 2016, the state appellate court affirmed the judgment of the trial court. (Doc. No. 5-1 at Exh. 29.)

On October 11, 2016, Hewitt, proceeding *pro se*, filed a Notice of Appeal to the Supreme

12

Court of Ohio.  (Doc. No. 5-1 at Exh. 30.)  In his Memorandum in Support of Jurisdiction,

Hewitt raised the following Proposition of Law:

> I.    The Defendant-Appellant, Michael Hewitt, was denied his due process
>        rights under the United States and Ohio Constitutions  when the trial court
>        denied his Motion for Copy or Use of Court Transcripts at the State's
>        Expense for preparation of an App.R. 26(B) Application for Reopening.

(Doc. No. 5-1 at Exh. 31.) The State filed a brief in response.  (Doc. No. 5-1 at Exh. 32.)

On February 22, 2017, the Supreme Court of Ohio declined to accept jurisdiction of the

appeal pursuant to S.Ct. Prac. R. 7.08(B)(4).  *See* Docket Sheet for *State v. Hewitt*, Case No.

2016-1492.

**D.    Federal Habeas Petition**

On November 29, 2016,[4] Hewitt filed a Petition for Writ of Habeas Corpus in this Court

and asserted the following grounds for relief:

> **GROUND ONE**:    Petitioner was denied his right to a fair trial in violation of his
>                    Due Process Rights under the Fourteenth Amendment to the
>                    United States Constitution when the trial court admitted
>                    photographs taken from his cell phone.
>
> **Supporting Facts**:    Petitioner filed a pre-trial Motion in Limine to
>                    exclude photos of guns and paraphernalia taken from
>                    his cell phone, which was overruled.  The record
>                    clearly shows that all but one of the weapons pictured
>                    were not the suspected murder weapon, a revolver,
>                    and not a single witness could say any more about the
>                    one picture of a revolver other than it was similar to
>                    the suspected murder weapon because the picture was

---

[4]  Under the mailbox rule, the filing date for a *pro se* petition is the date that a petitioner
delivers it to prison authorities.  *See Houston v. Lack*, 487 U.S. 266, 108 S.Ct. 2379, 101
L.Ed.2d 245 (1988).  While the Petition herein did not arrive at the Court for filing until
December 16, 2016, Hewitt states that he placed it in the prison mailing system on November
29, 2016.  (Doc. No. 1 at 9.)  Thus, the Court will consider the Petition as filed on November
29, 2016.

13

not very clear.

**GROUND TWO**:   Petitioner was denied his right to a fair trial in violation of his Due Process rights under the Fourteenth Amendment to the United States Constitution when the trial court admitted evidence of and argument about "other acts" which were prohibited by Ohio Evidence Rule 404.

**Supporting Facts**:   At trial, the State elicited testimony that the day before the shooting/murder, Petitioner had damaged the vehicle of a female, Courtney Jackson, he had been dating.  The victim of the criminal damaging incident was not the victim of the shooting.  The State failed to establish any connection, not to mention a motive to kill the murder victim, William Johnson, arising out of the damaging of Courtney's vehicle.  The court overruled the Motion to Suppress regarding the prior criminal damaging incident.

**GROUND THREE**:  Petitioner was denied his right to a fair trial in violation of his Due Process rights under the Fourteenth Amendment to the U.S. Constitution when the trial court denied his Motion to Suppress gestures he made while in custody.

**Supporting Facts**:   While Petitioner was at the police station under arrest and in handcuffs, but prior to being advised of his right to remain silent, the detectives informed Petitioner that he was obtaining a warrant for his DNA and that a gunshot residue test would be performed on his hands.  In response to the latter statement, Petitioner wiped his hands on his shirt. The State claimed, and the trial court agreed, that Petitioner's "gesture" was admissible as it was not made in response to a "question."  The trial court correctly determined, however, that his gesture was a statement for purposes of Miranda.  A pretrial Motion to Suppress alleging a Miranda violation was overruled.

**GROUND FOUR**:   There was insufficient evidence presented at trial to convict Petitioner of murder, in violation of his Due Process rights under the Fourteenth Amendment to the U.S. Constitution.

**Supporting Facts**:   Petitioner and the victim, William Johnson, were well

14

known to be good friends.  No revolver or gun of any type that would have been connected to the shooting of Johnson was ever produced at trial.  Testing of Petitioner's clothing and skin revealed no blood belonging to Johnson.  Also, no DNA belonging to Johnson was detected on Petitioner.  Testimony from two State's witnesses, Eric Freeman and Lillis Miller, were incomplete, inconsistent, and contradictory and certainly not sufficient to prove that Petitioner was the person guilty of shooting Johnson. When shown a photo of Petitioner showing his physical appearance at the time of the shooting, Freeman stated that Petitioner was not the person he had observed fleeing the scene the night of the shooting.  He further indicated that, from his vantage point, he would not have been able to see anyone leaving the area in a southerly direction.  Miller, who lives near the scene of the shooting, could not positively identify Petitioner as the shooter.  And when shown the photo of a revolver taken from Petitioner's phone, stated it was not the same gun she saw used in the shooting.

(Doc. 1.)

On February 10, 2017, Warden Charmaine Bracy ("Respondent") filed her Return of Writ. (Doc. No. 5.)  Hewitt filed a Traverse on March 20, 2017.  (Doc. No. 6.)

On June 12, 2018, the undersigned ordered Respondent to supplement the habeas record with a full and complete copy of the state court trial transcript.  (Doc. No. 8.)  Respondent complied on June 13, 2018.  (Doc. No. 9.)

### III.  Exhaustion and Procedural Default

**A.      Legal Standard**

Petitioners must exhaust their state remedies prior to raising claims in federal habeas corpus proceedings.  *See* 28 U.S.C. § 2254(b),(c).  This requirement is satisfied "when the highest court in the state in which the petitioner was convicted has been given a full and fair

opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir.1990).

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice. *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)).  A claim may become procedurally defaulted in two ways. *Id.*  First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court. *Id. See also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.[5]  *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).  If, at the time of the federal habeas

---

[5] In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted. 785 F.2d at 135. Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice." *Id.* at 138–39; *Barkley v. Konteh*, 240 F. Supp.2d 708 (N.D. Ohio 2002). "In determining whether a state court actually enforced a procedural rule, we apply the 'plain statement' rule of *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)." *Lovins v. Parker*, 712 F.3d 283, 296 (6th Cir. 2013) ("a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar.") (citations omitted).

petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac,* 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) ("a claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.")  This second type of procedural default is often confused with exhaustion.  Exhaustion and procedural default, however, are distinct concepts.  AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition."  *Engle*, 456 U.S. at 125 n. 28.  Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review.  *Id.*  In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal.  *Id.*  Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted.  *Id.*

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim.  *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue-not merely as an issue arising under state law."  *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal

constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

A petitioner's procedural default, however, may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error. *See Maupin*, 785 F.2d at 138–39. "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with constitutional error." *Id.* Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied. *See United States v. Frady*, 456 U.S. 152, 172, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219–20 (6th Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different. *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice." *See Coleman*, 501 U.S. at 749–50. Conclusory statements are not enough—a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence,

18

trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial."

*Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).  *See also Jones v.*

*Bradshaw*, 489 F. Supp.2d 786, 807 (N.D. Ohio 2007); *Allen v. Harry*, 2012 WL 3711552 at * 7

(6th Cir. Aug. 29, 2012).

**B.      Application to Petitioner – Ground One**

In his first Ground for Relief, Hewitt argues his due process rights were violated when

the trial court admitted photographs of "guns and paraphernalia" from his cell phone.  (Doc. No.

1 at 4.)  He maintains "all but one of the weapons pictured were not the suspected murder

weapon, a revolver, and not a single witness could say any more about the one picture of a

revolver other than it was similar to the suspected murder weapon because the picture was not

very clear."  (*Id*.)

Respondent argues Ground One is procedurally defaulted because Hewitt failed to

contemporaneously object to the introduction of the photographs at issue at trial and, thus, the

state appellate court reviewed the claim for plain error.  (Doc. No. 5 at 13.)  Respondent further

asserts Hewitt has failed to demonstrate either cause or prejudice to excuse the default and,

further, has not produced any new, reliable evidence that he is actually innocent.  (*Id*. at 15-16.)

The record reflects Hewitt raised a claim regarding the admission of the photographs at

issue on direct appeal to both the state appellate court and the Supreme Court of Ohio.  (Doc.

No. 5-1 at Exhs. 15, 21.)  The state appellate court addressed the claim as follows:

> {¶ 44} In his first assignment of error, appellant argues the trial court erred in
> admitting photographs of unrelated firearms into evidence because the probative
> value of the photos was outweighed by the danger of unfair prejudice to appellant.
> We disagree.
>
> {¶ 45} We begin our analysis by noting appellant has not identified the specific

19

photos or exhibits  he challenges but refers generally to photos of guns which are not the murder weapon and a photo of "appellant posing with guns." Upon our review of the trial record, we find the following relevant exhibits were admitted by appellee:

1) State's Ex. 8–C: photo from appellant's cell phone of shotguns and black revolver

2) State's Ex. 8–D: photo from appellant's cell phone of appellant firing a revolver at a shooting range

3) State's Ex. 10–A: photo from search of 820 Milton showing grill on front porch inside which was discovered ammunition  unrelated to murder

4) State's Ex. 10–B: photo from search of 820 Milton showing close-up of shotgun on closet shelf

5) State's Ex. 10–C: photo from search of 820 Milton showing same closet in different view than above

6) State's Ex. 10–D: photo from search of 820 Milton showing shotgun and blue firearm case

7) State's Ex. 10–E: photo from search of 820 Milton showing two shotguns laying on blue case

8) State's Ex. 10–F: close-up photo of gas grill on porch at 820 Milton inside which ammunition was found

9) State's Ex. 10–G: photo of lid of gas grill raised revealing box of "Blazer" ammunition

10) State's Ex. 11–B: photo of black pistol on T.V. tray found at 1222 Ford Court.

11) State's Ex. 11–C: close-up of black pistol above on T.V. tray found at 1222 Ford Court.

12) State's Ex. 11–D: shotgun and damaged target found at 1222 Ford Court.

13) State's Ex. 11–E: different view of T.V. tray showing black firearms case on the floor of 1222 Ford Court.

{¶ 46} Appellee's brief states the photo exhibits were admitted without objection, but we note the trial prosecutor refers to a hearing on a motion in limine regarding "what phone, what pictures from the gun, what pictures of guns could be used from the phone. And I specifically went through the Court and explained why I wanted the pictures that I chose, how they linked up to this particular crime." (T. 176). We have thoroughly reviewed this trial record and are unable to find this discussion, although the trial court noted immediately prior to trial all rulings in the first jury trial were incorporated into the second trial.  (T. 4).

{¶ 47} We have not been provided with the record of the hearing on this motion in limine which may have been helpful in shedding light on appellee's purpose in admitting the photos.  Providing the record is appellant's responsibility, however. In *Knapp v. Edwards Laboratories,* the Ohio Supreme Court stated: "The duty to provide a transcript for appellate review falls upon the appellant.  This is necessarily so because an appellant bears the burden of showing error by reference to matters in the record." 61 Ohio St.2d 197, 199, 400 N.E.2d 384 (1980).

{¶ 48} Nevertheless, even if there was a motion in limine regarding the gun photos, appellant did not renew any objection when appellee introduced the photos and has thus waived all but plain error.  "In general, the ruling on a motion in limine does not preserve the record on appeal and an appellate court need not review the ruling unless the claimed error is preserved by an objection at trial."  *State v. Pyo*, 5th Dist. Delaware No. 04CAA01009, 2004–Ohio–4768, ¶ 19, citing *State v. Grubb*, 28 Ohio St.3d 199, 503 N.E.2d 142 (1986), paragraph two of the syllabus; *State v. Leslie*, 14 Ohio App.3d 343, 344, 471 N.E.2d 503 (2nd Dist.1984); *State v. Brown*, 38 Ohio St.3d 305, 528 N.E.2d 523 (1988), paragraph three of the syllabus; *State v. Maurer*, 15 Ohio St.3d 239, 259, 473 N.E.2d 768 (1984).

{¶ 49} Our standard of review in this case is therefore plain error.  Criminal Rule 52(B) provides that "plain errors or defects effecting substantial rights may be noticed although they were not brought to the attention of the court."  In order to prevail under a plain error analysis, appellant bears the burden of demonstrating the outcome of the trial clearly would have been different but for the error.  Notice of plain error must be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.  *State v. Simmons*, 5th Dist. Stark No.2001CA00245, 2002–Ohio–3944, at ¶ 11, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph 3 of the syllabus; *State v. D'Ambrosio*, 67 Ohio St.3d 185, 191, 1993–Ohio–170, 616 N.E.2d 909.

{¶ 50} Admission of inflammatory evidence with no legitimate probative value may contaminate the integrity of a verdict.  In *State v. Hurt*, the appellant was convicted upon one count of unlawful sexual conduct with a minor and the evidence at trial established appellant, a male, engaged in sexual conduct with a male minor. 158 Ohio App.3d 671, 2004–Ohio–4266, 821 N.E.2d 1033 (2nd Dist.).  Over objection,

21

the state entered photos of male genitals found on the appellant's computer even though the photos were not probative of any issue in the case; i.e., there was no allegation these photos had been shown to the minor or were of the minor.  The state argued admission of the photos was permissible under Evid.R. 613(C) as extrinsic evidence of conduct inconsistent with the testimony of a witness, offered solely for impeachment, because possession of images of men and male genitalia on his computer was inconsistent with appellant's testimony at trial.  The appellate court disagreed, finding "no reasonable basis for the prosecution to have proceeded along these lines" because the photographs have no probative value as to whether Hurt engaged in sexual conduct with N.F. or any other person."  Not only, therefore, were the pictures not admissible under Evid.R. 613, but "[b]ecause the verdict was based primarily on the jury's assessment of the credibility of the witnesses and because the improper admission of the pictures could have negatively affected the jurors' determination of [appellant's] credibility, we cannot find this error to have been harmless."  *State v. Hurt*, 158 Ohio App.3d 671, 2004–Ohio–4266, 821 N.E.2d 1033, at ¶ 40 (2nd Dist.).

{¶ 51} In this case, what we will refer to as "photos of unrelated guns" were not probative of any element in the case.  Appellant did not testify and there was no claim on his behalf that he had no access to guns; in fact, Laird, D.H., and appellant's father testified that appellant, his father, and his brother owned a number of firearms.  The victim was shot and killed by a revolver, and one eyewitness recalls that the revolver used was silver or otherwise "bright" and shiny and not black "because she would not have been able to see it." (T. III, 438).  All of the pictured revolvers are black.  Appellee's witnesses admitted there was no way to determine whether any of the revolvers pictured were the murder weapon.  The question is, therefore, why did appellee admit the photos of unrelated guns?

{¶ 52} Here, appellee responds the photos of unrelated guns were relevant because "it was incumbent on the state to demonstrate that [appellant] was familiar with weapons, possessed them and had access to them." (Brief, 15).  Appellee also asserts the gun shown in the photo of appellant at a firing range, State's Ex. 8–C, "was particularly relevant as a revolver was believed to be used in the killing of Mr. Johnson."  State's Ex. 8–C was shown to L.M. and she said it was not the gun she saw used to shoot the victim (T. III, 438).  The criminalist from the Stark County Crime Lab testified the revolver in State's Ex. 8–C is capable of firing the type of cartridges that killed Johnson, but without examining the weapon, he could not determine whether it is the same gun.  (T. II, 331).

{¶ 53} We also note that the "photos of unrelated guns" include photos not depicting revolvers at all.  Appellee directs our attention to *State v. Trimble*, in which the Ohio Supreme Court considered the admissibility of numerous weapons that were unrelated to the crime charged.  *State v. Trimble*, 122 Ohio St.3d 297, 2009–Ohio–2961, 911 N.E.2d 242.  The Court disagreed with the state's arguments

22

that the guns were relevant to show prior calculation and design and to show the appellant's familiarity with firearms; however, the Court did accept the state's argument that the unrelated weapons the appellant's possession of a large number of firearms tended to show that he was familiar with using such weapons, evidence the state could use to rebut claims he accidentally shot the victim.  *Id*. at ¶ 110. The *Trimble* Court based its conclusion in part on its rationale in *State v. Kamel*, in which the issue of the defendant's drug use was put into issue by defendant, and therefore, the topic of the defendant's drug use "became open to all relevant inquiry in the discretion of the trial court."  *State v. Kamel*, 12 Ohio St.3d 306, 312, 466 N.E.2d 860, (1984).

{¶ 54} Appellee argues appellant put his access to guns into question and points to the following in appellant's opening statement: "The issue is [appellant]—there is, obviously, at some point a gunshot. However, [appellant] didn't have a gun. [Appellant] didn't fire a gun." (T.I, 129).  The defense goes on to state that appellant was at the scene and got scared and ran away, but he did not fire a gun that night. (T. I, 130).  In the context of the entire opening statement, therefore, appellant was not claiming he didn't own a gun at all, only that he didn't have one with him, or use one, the night of the murder.

{¶ 55} The *Trimble* Court also opined that even if the evidence of other firearms should not have been admitted, the admission was harmless because there was overwhelming evidence of the appellant's guilt.  *Trimble, supra*, 2009–Ohio–2961 at ¶ 110.

{¶ 56} In the instant case, we find the photos of other guns were not relevant to appellee's case and were not entered to rebut argument by appellant. [footnote omitted] The issue remaining, therefore, is whether appellant has met his burden of demonstrating the outcome of the trial clearly would have been different but for admission of the photos of other guns.  We find the answer is no.  Admission of the photos of other guns was therefore harmless error.

{¶ 57} The evidence in this case is circumstantial, but upon our review of the trial record and exhibits, we find it to be compelling.  The evidence established appellant was at the scene of the murder; the defense admitted as much in opening statement. Appellant's D.N.A. was on the t-shirt found nearby and his cell phone was found at the scene.  The female neighbor saw two men fighting and no one else in the area; as they fought, the "brighter-skinned man" pulled a gun from his pants and shot the black man.  All of this happened within moments: the assailant drew the weapon, the witness hit the floor, and gunshots were fired.  The conclusion we must draw is the person who fought with the victim is the person who shot him.

{¶ 58} We further conclude the evidence demonstrates appellant is the shooter.  The timing of appellant's texts has him walking home at 8:23 p.m. and then the texts

23

become unanswered and unread; the phone is shortly thereafter found at the scene of the murder, still playing music.  The evidence supports the conclusion appellant encountered Johnson as he walked home and they fought in the mosque parking lot. This evidence is underscored by appellant's D.N.A. under the Johnson's fingernails and the photos taken of appellant shortly after arrest with injuries to his hands, face, and trunk.

{¶ 59} We cannot conclude that absent the photos of other guns, appellant would have been found not guilty; these are not the exceptional circumstances which would give rise to a finding of plain error.  Admission of the photos was therefore harmless, and appellant's first assignment of error is overruled.

*State v. Hewitt*, 2015 WL 2194185 at * 6-9.

In Ohio, a petitioner waives an alleged error when he fails to make a contemporaneous objection.  *Osborne v. Ohio*, 495 U.S. 103, 124, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (recognizing Ohio's long-standing contemporaneous objection rule).  The Sixth Circuit has held that Ohio's "contemporaneous objection rule is an adequate and independent state ground barring federal habeas review, *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir.2005), and that plain-error review is not inconsistent with the procedural default."  *Awkal v. Mitchell*, 613 F.3d 629, 648–649 (6th Cir.2010) (citing *Lundgren*, 440 F.3d at 765); *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir.2001). "The state court's plain error review did not constitute a waiver of the procedural default."  *Mason v. Brunsman*, 483 Fed. Appx. 122, 130–31 (6th Cir.2012).  *See also Shafer v. Wilson*, 364 Fed. Appx. 940, 945 (6th Cir.2010) (finding the State of Ohio expressly enforced its contemporaneous objection rule where "the last state court to render a reasoned opinion in this case, the Ohio Court of Appeals on direct appeal, noted the failure to object, applied plain-error review, and denied [appellant's] claims for relief.")

Here, Hewitt does not challenge Respondent's argument that this claim is procedurally defaulted, nor does he argue there is cause and prejudice to excuse the default.  Thus,

Respondent's argument that Ground One is procedurally defaulted is essentially unopposed.

As the state appellate court correctly noted, although Hewitt filed a pre-trial Motion in Limine, he did not object to the admission of the photographs at issue at trial.[6]  Accordingly, the first three elements of *Maupin* test are satisfied as Hewitt failed to comply with the contemporaneous objection rule, the state appellate court actually enforced the rule, and the rule constitutes an "independent and adequate" state ground on which the state can foreclose federal review.  As such, and in the absence of any meaningful opposition on this issue, the Court finds Ground One of the instant Petition is procedurally defaulted.

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice.  *See Lundgren*, 440 F.3d at 763 (citing *Wainwright*, 433 U.S. at 87.)  As noted above, "[d]emonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule."  *Franklin*, 434 F.3d at 417 (6th Cir.2006) (quoting *Murray*, 477 U.S. at 488.  Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different.  *See Mason*, 320 F.3d at

---

[6] Hewitt does not challenge the state appellate court's conclusion that "even if there was a motion in limine regarding the gun photos, appellant did not renew any objection when appellee introduced the photos and has thus waived all but plain error."  *Hewitt* at 2015 WL 2194185 at *7.  The Court also notes that a state court's interpretation of state law binds a federal court sitting in habeas corpus.  *See Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005); *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).  Thus, and in the absence of any argument to the contrary, the Court finds it is bound by the state appellate court's determination that, although Hewitt filed a pre-trial motion in limine, the failure to contemporaneously object at trial waived all but plain error pursuant to state law.

629. Here, Hewitt has neither presented any cause for his default nor has he alleged ensuing prejudice or a manifest miscarriage of justice.[7]  In addition, Hewitt has not come forward with any new, reliable evidence to support a credible claim of actual innocence.

Accordingly, and for all the reasons set forth above, it is recommended Ground Four be dismissed as procedurally defaulted.

## IV.  Review on the Merits

### A.    Legal Standard

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

---

[7] The Court notes ineffective assistance of counsel may serve as cause to excuse the procedural default of a claim if it rises to the level of a constitutional violation, but only if the underlying claim of ineffective assistance of counsel is not itself defaulted.  *See Martin v. Mitchell*, 280 F.3d 594, 605 (6th Cir. 2002); *Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012).  Here, Hewitt did not raise, on direct appeal, a claim of ineffective assistance of counsel based on defense counsel's failure to contemporaneously object at trial to the admission of the photographs at issue.  Nor did Hewitt file a 26(B) Application based on appellate counsel's failure to raise a claim of ineffective assistance of trial counsel with respect to this issue.  Thus, even if Hewitt had argued the ineffective assistance of trial counsel was cause to excuse the default of this claim, such an argument would be without merit because any underlying ineffective assistance of counsel claim is itself defaulted.  With regard to the issue of prejudice, the Court notes the state appellate court found admission of these photographs was harmless error.  Hewitt has not argued or demonstrated there is a "reasonable probability" that the outcome of the trial would have been different had these photographs been excluded.

> Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings (as opposed to the dicta) of the United States Supreme Court. *See Parker v. Matthews*, 567 U.S. 37, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012); *Renico v Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Shimel v. Warren,* 838 F.3d 685, 695 (6th Cir. 2016); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). Indeed, the Supreme Court has indicated that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court." *Parker*, 567 U.S. at 48-49; *Howes v. Walker*, 567 U.S. 901, 132 S.Ct. 2741, 183 L.Ed.2d 612 (2012). *See also Lopez v. Smith*, ⸺ U.S. ⸺, 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.' " (quoting *Marshall v. Rodgers*, 569 U.S. 58, 133 S.Ct. 1446, 1450, 185 L.Ed.2d 540 (2013))).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413. By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id. See also Shimel*, 838

27

F.3d at 695.  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly."  *Williams v. Taylor,* 529 U.S. at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions."  *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA.  *Id.* at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Id.* at 785.  The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal."  *Id.* (internal quotation marks omitted).  Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*. at 786–87.  This is a very high standard, which the Supreme Court readily acknowledged.  *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

28

1.      **Ground Two**

In his Second Ground for Relief, Hewitt argues his due process rights were violated when the trial court admitted evidence of and argument about the criminal damaging incident involving Ms. Jackson's car.  (Doc. No. 1 at 5.)  Specifically, Hewitt argues it is "questionable how identification of the Petitioner as the perpetrator in the criminal damaging incident correlates to his identification as the perpetrator in the shooting death of Johnson."  (Doc. No. 6 at 6.)  He asserts that "[a]t best, the first incident may have given Johnson motive to harm Petitioner (or at least reason for hostility towards him) but there is no logical connection in the other direction." (*Id.*)  Rather, Hewitt maintains the "criminal damaging incident gave rise to Petitioner fearing for his safety "and "would have caused [him] to be prepared to act in self-defense."  (*Id.*)

Respondent argues "the state appellate court reasonably found that the criminal damaging incident generated hostility related to the murder in this case, and was admissible for the purpose of motive in accordance with Ohio Evid. R. 404(B)."  (Doc. No. 5 at 32.)

The record reflects Hewitt raised the a claim regarding the admission of evidence of the criminal damaging incident on direct appeal to both the state appellate court and the Supreme Court of Ohio.  (Doc. No. 5-1 at Exhs. 15, 21.)  The state appellate court addressed the claim as follows:

> {¶ 60} In his second assignment of error, appellant argues evidence of the criminal damaging to Cortney's vehicle was admitted in violation of Evid.R. 404(B) and R.C. 2945.59.  We disagree.
>
> {¶ 61} Prior to trial, appellant filed a motion in limine arguing the jury should not hear evidence of the criminal damaging to Cortney's vehicle which occurred the day before.  The trial court overruled the motion, finding the incidents are related and could give rise to motive and identification of appellant as the shooter.

29

(12/30/13 Motions, T. 17).  The trial court reserved the option of making a limiting instruction as to the reason the evidence was introduced.

{¶ 62} We concur with the trial court.  Evid.R. 404(B) states in pertinent part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. * * * *." The Rule is in accord with R.C. 2945.59, which states:

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

{¶ 63} In this case, the paramount issue is the identity of the shooter, and the criminal damaging incident only one day before sets the scene for the entire episode.  Appellant points out that Johnson was not involved in the criminal damaging incident and according to Laird and Cortney, either didn't witness it or was unwilling to get involved.  Nevertheless, other evidence shows the criminal damaging incident gave rise to motive.  Appellant's text messages establish a threat existed: he says he committed the criminal damaging in front of "Pie," and that threats were made to get "Chicago n——s" to "blaze" appellant.  Appellant took this threat seriously because he planned to leave the house he shared with Laird to go to his father's, telling D.H. he needed to "lay low" for a while.  Laird, too, testified that now appellant's weapons were spread around the house, instead of in his bedroom, because appellant perceived a need for protection.  Finally, appellant texted Scandra, "I got somewhere to stay n I got my heat."  It is apparent the criminal damaging incident gave rise to more hostility than the witnesses acknowledged.

{¶ 64} The evidence of the criminal damaging was properly admitted as proof of motive, intent, and the identity of appellant as the shooter.

{¶ 65} Appellant's second assignment of error is overruled.

*State v. Hewitt*, 2015 WL 2194185 at * 9-10.

As a general rule, an error of state law in the admissibility of evidence does not constitute

an infringement of a right guaranteed under the United States Constitution, and is not cognizable in habeas corpus.  *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2007); *Byrd v. Collins*, 209 F.3d 486, 528 (6th Cir.2000).  However, the Sixth Circuit has explained that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief."  *Bugh,* 329 F.3d at 512.  *See also Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir.2000); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000).  The Sixth Circuit has cautioned that "courts 'have defined the category of infractions that violate 'fundamental fairness' very narrowly."  *Bugh*, 329 F.3d at 512 (citations omitted).  *See also Dowling v. United States*, 493 U.S. 342, 352–53, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990); *Burger v. Woods*, 2013 WL 613382 at * 2 (6th Cir. Feb. 20, 2013) ("A due process claim premised on a mistaken state court evidentiary ruling faces a steep climb.").  "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Seymour*, 224 F.3d at 552 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996)).  Moreover, in order to obtain habeas relief in this context, a petitioner must establish "actual prejudice" from the admission of the allegedly improper evidence.  *Clemmons v. Sowders*, 34 F.3d 352, 357–58 (6th Cir. 1994).  *See also Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000) (petitioner must show that admission of improper evidence is "material in the sense of a crucial, critical highly significant factor"); *Burger,* 2013 WL 613382 at * 3 (same).

In *Bugh*, the Sixth Circuit considered whether a petitioner's due process rights were violated by the admission of evidence concerning prior criminal conduct by petitioner.  *Bugh,*

329 F.3d at 511.  In that case, the petitioner argued that the admission of this evidence was so

prejudicial that it "poisoned the trial and violated [his] right to a fundamentally fair trial."  *Id.*

The Sixth Circuit found the petitioner was not entitled to habeas relief with respect to this claim,

as follows:

> In this case, the admission of prior bad acts evidence was not contrary to clearly established Supreme Court precedent. There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence.  In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior injury evidence violated due process, thus warranting habeas relief.  502 U.S. 62, 75, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).  The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime.  *Id.* at 75 n. 5, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385.  Moreover, in *Spencer v. Texas*, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967), the Supreme Court rejected the argument that the Due Process Clause requires the exclusion of prejudicial evidence, even though limiting instructions were given and a valid state purpose is served.  *Id.* at 563–64, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606. The Court recognized that it was not "a rule-making organ for the promulgation of state rules of criminal procedure.  And none of the specific provisions of the Constitution ordains this Court with such authority." *Id.* at 564, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606.  While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, see *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), it has not explicitly addressed the issue in constitutional terms. Accordingly, the district court correctly found that there is no Supreme Court precedent that the trial court's decision could be deemed "contrary to," under AEDPA.

*Id.* at 512 –513.

The Court reaches a similar conclusion in the instant case.  Hewitt has not directed this

Court's attention to any Supreme Court precedent finding a federal due process violation as a

result of the admission of prior bad act evidence during a state criminal trial.[8]  *See Hatten v. Rivard*, 2018 WL 3089204 at * 1 (6th Cir. May 9, 2018); *Bailey v. Lafler*, 722 Fed. Appx. 425, 435 (6th Cir. Jan. 19, 2018).  *See also Susalla v. Harry*, 2017 WL 6420227 at * 2 (6th Cir. Dec. 18, 2017) (noting there is no clearly established Supreme Court precedent holding a state violates due process by permitting bad acts evidence); *Robinson v. Klee*, 2017 WL 6003437 at * 2 (6th Cir. Jan. 9, 2017) (same).  Accordingly, Hewitt has failed to demonstrate the state appellate court on this issue was contrary to, or an unreasonable application of, clearly established federal law.

Moreover, as the Sixth Circuit has explained, "[t]o our knowledge, the Supreme Court has never held (except *perhaps* within the capital sentencing context) that a state trial court's admission of *relevant* evidence, no matter how prejudicial, amounted to a violation of due process."  *Blackmon v. Booker*, 696 F.3d 536, 551 (6th Cir. Oct. 9, 2012) (emphasis in original)

---

[8] The Court notes that, in his Memorandum in Support of Jurisdiction to the Supreme Court of Ohio, Hewitt cited *Old Chief v. U.S.*, 519 U.S. 172, 180-182, 117 S.Ct. 644 (1997) in support of his argument he was entitled to relief on this issue.  (Doc. No. 5-1 at Exh. 21, Page ID# 255- 56).  The Court finds Hewitt's reliance on that case is misplaced.  In *Old Chief*, a federal criminal case, the Supreme Court held that the district court erroneously allowed the prosecution to use the full record of the defendant's prior conviction of assault resulting in serious bodily injury, in violation of 18 U.S.C. § 1154, to prove the element of a prior felony conviction necessary for his unlawful possession of a firearm charge under 18 U.S.C. § 922(g)(1).  *Old Chief*, 519 U.S. at 174.  The Supreme Court found this was particularly problematic, given that the defendant had offered to stipulate to the fact of his prior felony conviction in order to avoid the danger of unfair prejudice resulting from the presentation of evidence regarding the name and nature of that prior conviction to the jury. *Id*. at 175. The instant case, however, is distinguishable from *Old Chief* because that case interpreted Federal Rule of Evidence 403 and did not address whether the admission of prior acts testimony gave rise to a federal constitutional violation.  *See Emerick v. Prelesnick*, 2012 WL 3194493 at * 5 (6th Cir. Aug.8, 2012) (in habeas case, distinguishing *Old Chief* on the grounds that it "did not address whether the inclusion of prior acts testimony gave rise to a constitutional violation").

(citing *Dowling v. United States*, 493 U.S. 342, 352–54, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (holding the admission of prior bad acts evidence that had "the potential to prejudice the jury" but was "at least circumstantially valuable in proving petitioner's guilt" did not violate due process)).  *See also Johnson v. Gidley*, 2016 WL 7131505 at * 2 (6th Cir. Dec. 6, 2016); *Alfetlawi v. Klee*, 2017 WL 4957420 at * 6 (E.D. Mich. Nov. 1, 2017).  Here, the state appellate court reasonably determined evidence of the criminal damaging incident was relevant because it "set[] the scene for the entire episode."  *Hewitt*, 2015 WL 2194185 at * 10.  As that court noted, evidence regarding the incident (which occurred the day before the shooting) was relevant to (1) the relationship between Hewitt and his neighbors (i.e., Ms. Jackson and the victim Mr. Johnson) during the time period directly preceding the shooting; (2) Hewitt's perception he was in danger as a result of the incident; and (3) a possible motive for the altercation that led to the death of Mr. Johnson.  *Id.*  In light of the above, the Court finds Hewitt cannot demonstrate the admission of this evidence amounted to a violation of due process.

Accordingly, it is recommended Hewitt's Second Ground for Relief be denied.

## 2.     Ground Three

In his Third Ground for Relief, Hewitt argues his due process rights were violated when the trial court denied his motion to suppress evidence that he wiped his hand after being told by Detective Prince that police were in the process of obtaining a warrant to perform a GSR test. (Doc. No. 1 at 6.)  Relying on *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), Hewitt argues Detective Prince's statement about the GSR test amounted to an "interrogation" for purposes of *Miranda* because that statement was "reasonably likely to evoke an incriminating response."  (Doc. No. 6 at 3-4.)  He asserts "[f]or the average person being held

in custody, to be informed by authorities that they intend to perform GSR and DNA testing on him/her would surely induce the same level of stress consistent with that of any custodial interrogation" and "in turn, could certainly precipitate the type of involuntary gesture evoked in Petitioner."  (*Id*. at 4.)  Thus, Hewitt asserts he was "subject to the functional equivalent of interrogation [and] should have been provided *Miranda* warnings prior to Sgt. Prince informing him of the GSR and DNA testing."  (*Id.* at 5.)

Respondent argues "the state appellate court properly overruled Hewitt's third ground for relief because [his] hand-wiping gesture was not response to interrogation; and thus, it did not trigger a *Miranda* analysis."  (Doc. No. 5 at 28.)

The record reflects Hewitt raised this claim on direct appeal to both the state appellate court and the Supreme Court of Ohio.  (Doc. No. 5-1 at Exhs. 15, 21.)  The state appellate court considered this claim on the merits and rejected it as follows:

{¶ 66}  In his third assignment of error, appellant argues the trial court should have granted his motion to suppress evidence of his hand-wiping gesture when police informed him of a possible gunshot-residue test.  We disagree.

{¶ 67} Appellate review of a trial court's decision to deny a motion to suppress involves a mixed question of law and fact.  *State v. Long*, 127 Ohio App.3d 328, 332, 713 N.E.2d 1 (4th Dist .1998).  During a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and to evaluate witness credibility.  *State v. Brooks*, 75 Ohio St.3d 148, 154, 661 N.E.2d 1030 (1996).  A reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence.  *State v. Medcalf*, 111 Ohio App.3d 142, 145, 675 N.E.2d 1268 (4th Dist.1996). Accepting these facts as true, the appellate court must independently determine as a matter of law, without deference to the trial court's conclusion, whether the trial court's decision meets the applicable legal standard.  *State v. Williams*, 86 Ohio App.3d 37, 42, 619 N.E.2d 1141 (4th Dist.1993), overruled on other grounds.

{¶ 68} There are three methods of challenging a trial court's ruling on a motion to suppress on appeal.  First, an appellant may challenge the trial court's finding

of fact. In reviewing a challenge of this nature, an appellate court must determine whether the trial court's findings of fact are against the manifest weight of the evidence. *See, State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Klein*, 73 Ohio App.3d 486, 597 N.E.2d 1141 (4th Dist.1991). Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. *See, Williams, supra*. Finally, an appellant may argue the trial court has incorrectly decided the ultimate or final issues raised in a motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry*, 95 Ohio App.3d 93, 96,620 N.E.2d 906 (8th Dist.1994).

{¶ 69} Appellant moved to suppress evidence of the hand-wiping gesture, arguing the gesture was a coerced "statement" in violation of his *Miranda* rights. Evidence at the hearing established appellant was arrested for criminal damaging and brought into an interview room in handcuffs. Sgt. Prince told appellant he would seek search warrants for appellant's D.N.A. and for a gunshot-residue test, at which point appellant wiped his right hand on his clothing. Prince testified he had not Mirandized appellant at that point because he had not asked him any questions; upon the beginning of questioning, he did Mirandize appellant and appellant immediately requested counsel. Prince's statement about the GSR test was not intended to elicit a response and Prince was merely explaining what would be happening.

{¶ 70} It is well-established that the state may not introduce statements of an accused unless the accused was informed of his constitutional rights to counsel and against self-incrimination and effectively waived these rights. *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, law enforcement officers need only inform the accused of these rights when the accused is subject to custodial interrogation. *Id*. The *Miranda* court defined "custodial interrogation" as " * * * questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom to act in any significant way." *Id*. Further, law enforcement officers need not give warnings where the accused volunteers the statements without questioning. *Id*. at 479.

{¶ 71} In addition, the right against self-incrimination during custody extends only to interrogation and its "functional equivalent." *Rhode Island v. Innis* (1980), 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297, 308. The term "interrogation" refers not only to "express questioning" but also "words or actions on the part of the police * * * reasonably likely to elicit an incriminating response from the suspect." *Id*. "Interrogation," for purposes of *Miranda*, must reflect a measure of compulsion above and beyond that inherent in custody itself. *Rhode*

*Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

{¶ 72} The issue in this case is whether Prince should have known his statement about the G.S.R. test was reasonably likely to provoke an incriminating response. "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301–02, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980). We find appellant's gesture in response to Prince's statement was just such an "unforeseeable result."

{¶ 73} **We agree with the trial court that appellant's gesture was not made in response to interrogation; that is, we find the officer would not necessarily have known his statement about a pending G.S.R. test was reasonably likely to elicit an incriminating response.** The trial court thus properly overruled the motion to suppress.

{¶ 74} Appellant's third assignment of error is overruled.

*State v. Hewitt*, 2015 WL 2194185 at * 10-12 (emphasis added).

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. The privilege against self-incrimination applies to the States through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The privilege against self-incrimination prohibits the government from using any statement against a criminal defendant "stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Miranda*, the Supreme Court held:

[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning ... [h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be

37

appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 478–79. *Miranda* warnings are intended to guard against the coercion inherent in a police-dominated environment where the interplay between interrogation and custody would " 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." *Rhode Island v. Innis*, 446 U.S. 291, 299, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (quoting *Miranda*, at 457–58, 86 S.Ct. 1602).

The procedural safeguards set forth in *Miranda* "are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Innis*, 446 U.S. at 300. The Supreme Court examined the meaning of the term "interrogation" in *Rhode Island v. Innis, supra.* In that case, police officers placed Innis under arrest for kidnapping, robbery, and murder, and advised him of his *Miranda* rights. *Id*. at 293–94. Innis stated he understood his *Miranda* rights and wanted to speak with an attorney. *Id*. at 294. Innis was placed in a patrol car with three officers and driven to the police station. *Id*. On the way to the station, the officers spoke to each other about the importance of finding the missing shotgun. *Id*. One officer testified they were "talking back and forth" and commented "that I frequent this area while on patrol and there's a lot of handicapped children running around [because a school for handicapped children was nearby], and God forbid one of them might find a weapon with shells and they might hurt themselves." *Id*. at 294–95. The second officer "more or less concurred . . . that it was safety factor and that we should, you know, continue to search for the weapon and try to find it." *Id*. The third officer said nothing but testified he overheard one of the officers say "it would be too bad if the little — I believe he said girl — would pick up the gun, maybe kill herself." *Id*. at 295. Innis then interrupted the conversation and showed the

officers where he had hidden the gun.  *Id.*

     The Supreme Court began by defining the term "interrogation. " *Id.* at 300.  The Court first noted "'[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.*  The Court further explained as follows:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. **That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect**. [footnote omitted]. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.  This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. **A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.**  [footnote omitted].  **But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response**. [footnote omitted].

*Id.* at 300-302.

     Applying these principles to the facts before them, the Supreme Court acknowledged the "subtle compulsion" inherent in the officers' conversation regarding the murder weapon but nonetheless held that no interrogation occurred.  "Given the fact that the entire conversation ... consisted of no more than a few off hand remarks," the Court could not say that it was "reasonably likely that Innis would so respond."  *Id.* at 303.  The Court noted the police did not carry on a "lengthy harangue" in the presence of the suspect and the officers' comments were not particularly "evocative."  *Id.*  As such, Innis "was not subjected by the police to words or actions

that the police should have known were likely to elicit an incriminating response." *Id*.

Interpreting *Innis*, the Sixth Circuit has acknowledged it "clearly establishes that interrogation includes express questioning or its functional equivalent—any words or actions that police should know are reasonably likely to elicit an incriminating response." *McKinney v. Hoffner*, 830 F.3d 363, 370 (6th Cir. 2016). The Sixth Circuit noted, however, that "[t]he Supreme Court has provided little additional guidance on what constitutes the functional equivalent of express questioning, although it has suggested that interrogation may be limited to 'compelling influences, psychological ploys, or direct questioning.'" *Id*. Examples provided by the Supreme Court of the "functional equivalent" of express questioning include reverse line-ups, positing the guilt of the suspect, and "the like." *Id*. (citing *Innis*, 446 U.S. at 299.)

*Innis*, thus, "provides a very general rule, and the Supreme Court has repeatedly emphasized that '[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" *Id*. (citing *Yarborough* [*v. Alvarado*,] 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) and *Parker v. Matthews*, 567 U.S. 37, 132 S.Ct. 2148, 2155, 183 L.Ed.2d 32 (2012)). As the Sixth Circuit recently explained:

> The more general the constitutional rule, the more leeway the state courts have to implement it. *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). At issue, we can all agree, is a "general rule." *Dickerson v. United States*, 530 U.S. 428, 441, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); *Van Hook v. Anderson*, 488 F.3d 411, 417–18 (6th Cir.2007) (en banc). The nature of this general inquiry—should a police officer "have known" that his conduct was "reasonably likely to elicit an incriminating response"?—permits a range of reasonable answers in a range of facts and circumstances. All of this makes it "less likely a state court's application of the rule will be unreasonable." *Desai v. Booker*, 732 F.3d 628, 631 (6th Cir.2013). Each of these factors considered, the state courts' answer in this instance fell well within the "range of reasonable applications of the standard." *Bedford v. Bobby*, 645 F.3d 372, 378 (6th Cir.2011) (per curiam).

*Bachynski v. Stewart*, 813 F.3d 241, 249 (6th Cir. 2015).

40

The question, then, before this Court is whether the state appellate court reasonably determined that Detective Prince's statement (i.e., that police were obtaining a warrant to perform a GSR test) was not "interrogation" for *Miranda* purposes because it not reasonably likely to elicit an incriminating response.  As noted *supra*, the state trial court conducted a hearing regarding Hewitt's motion to suppress evidence that he wiped his hand in response to Detective Prince's statement.  (Doc. No. 9-2.)  During this hearing, Detective Prince testified Hewitt was brought to the police station in handcuffs and taken to the interview room.  (*Id*. at Tr. 26-27.)  Detective Prince informed Hewitt who he was and advised him the police were going to give him a GSR test on his hands.  (*Id*.)  Hewitt then wiped his hand on his clothing.  (*Id*. at Tr. 27.)  At that point in time, Detective Prince had not given Hewitt his *Miranda* warnings.  (*Id*. at Tr. 25, 27-28.)  Detective Prince explained he could have *Mirandized* Hewitt but did not because "we just sat down to have a conversation.  My intentions were to *Mirandize* him when I began questioning which is what I did."[9]  (*Id.* at Tr. 28.)

The trial court found "the Defendant's gesture, whatever it might have been, was not in response to questioning of the Defendant" and was, therefore, not a *Miranda* violation.  (*Id*. at Tr. 30-31.)  The trial court further noted "it often happens that somebody blurts out something or says something in response to circumstances, not in response to a question or being interrogated;

---

[9] At trial, Detective Prince testified that, after Hewitt was arrested and taken to the police station, he "explained to him [Hewitt] that we were investigating the death of Mr. Johnson and that I was going to be collecting a DNA sample from him.  And I also expressed, advised him that I possibly would be taking a GSR, which is gunshot residue, swab from his hands; this would all be done through the course of a search warrant."  (Doc. No. 9-3 at Tr. 150.)  The State asked "what did he do?"  (*Id*.)  Detective Prince testified: "Ah, when I advised him of the GSR, he wiped his hands on a hospital gown that had been provided to him earlier."  (*Id*.)

41

and that is not a violation."  (*Id*. at Tr. 31.)  As noted above, the state appellate court affirmed the

trial court's ruling on this issue, finding Hewitt's "gesture was not made in response to

interrogation; that is, we find the officer would not necessarily have known his statement about a

pending G.S.R. test was reasonably likely to elicit an incriminating response."  *Hewitt*, 2015 WL

2194185 at * 12.

       For the following reasons, the Court finds the state appellate court's determination that

Hewitt was not "interrogated" within the meaning of *Miranda* is not contrary to, or an

unreasonable application of, clearly established federal law.  Detective Prince testified he did not

ask Hewitt any questions.  Rather, Detective Prince indicated that, once Hewitt was in the

interrogation room, he advised Hewitt who he was and informed him the police were in the

process of obtaining a warrant to perform DNA and GSR testing.  There is nothing in the record

to suggest the state appellate court unreasonably applied clearly established federal law when it

determined Detective Prince would not have known his statement was "reasonably likely to elicit

an incriminating response."  *Innis*, 446 U.S. at 302.  Hewitt does not argue or direct this Court's

attention to any evidence Detective Prince was aware Hewitt was "peculiarly susceptible" to a

statement of this kind, nor is there any evidence to suggest Detective Prince knew Hewitt was

"unusually disoriented or upset at the time of his arrest."  *Innis,* 446 U.S. at 302-303.  Moreover,

as in *Innis*, there is nothing to suggest the police "carried on a lengthy harangue" or that

Detective Prince's statement was "particularly evocative."  *Id*. at 303.  Under these

circumstances, it was not unreasonable for the state appellate court to determine that Hewitt's

hand-wiping gesture was a spontaneous and unforeseeable response to Detective Prince's

declaratory statement about the next steps in the investigation.[10]

Hewitt nonetheless asserts Detective Prince's statement was the "functional equivalent" of interrogation because, at the time the statement was made, he was under arrest on suspicion of murder, in handcuffs, and sitting in a police interrogation room.  The Supreme Court has held, however, that "'interrogation' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself."  *Innis*, 446 U.S. at 300.  Here, although Hewitt was in handcuffs and under arrest, there is no suggestion Hewitt was subjected to coercive police practices or that his will was "subjugated to" Detective Prince's.  Further, Hewitt does not cite any authority to support the argument that Detective Prince's statement rose to the level of "compelling influences, psychological ploys or direct questioning."  *McKinney*, 830 F.3d at 371.  Instead, Detective Prince's statement involved a brief conversation with Hewitt that included nothing more than information about what would be happening next in the investigation.

---

[10] Under analogous circumstances, the Sixth Circuit has found that voluntary responses to an officer's accurate declaratory statement are not the product of "interrogation" for *Miranda* purposes.  *See e.g., Hart v. Steward*, 623 Fed. Appx. 739, 746 (6th Cir. July 30, 2015) (finding defendant's response to officer's statement that "she realized what [defendant] had done, knew that he possibly had the weapon, and did not want him to hurt himself or anyone else" was admissible because it was not the product of "interrogation"); *Raedeke v. Trombley*, 2009 WL 751096 at *5 (6th Cir. Mar. 23, 2009) (holding a defendant's response to an officer's comment, "you are under arrest, you know what you are under arrest for," was admissible because the officer's comment "was an affirmative statement not intended to elicit a response"); *United States v. Hurst*, 228 F.3d 751, 760 (6th Cir.2000) (holding "the mere statement by [a law-enforcement official] that 've've got good information on you,' viewed in context, contains no compulsive element suggesting a Fifth Amendment violation"); *United States v. Murphy*, 107 F.3d 1199, 1205 (6th Cir.1997) (holding defendant's pre-*Miranda* incriminating statements made in response to an officer's advising him that "things would be easier for him if he talked" were admissible because they were voluntary and not the product of interrogation).

43

As the Sixth Circuit recently noted in a similar case, the question under AEDPA is not whether this Court agrees with the state appellate court's determination of this issue but "whether any fairminded jurist could conclude that [Detective Price's statement] was not interrogation." *McKinney*, 830 F.3d at 372.  Under the circumstances, and in light of *Innis*' general rule and the considerable leeway state courts have to implement it, the Court cannot find the state appellate court's refusal to characterize Detective Prince's statement as interrogation constitutes an "'extreme malfunction[] in the state criminal justice system.'" *Id.* (quoting *Harrington,* 562 U.S. at 102).  Under AEPDA's deferential standard, the Court finds the state appellate court did not unreasonably apply *Innis*.

Accordingly, and for all the reasons set forth above, the Court finds Hewitt's third ground for relief is without merit.

### 3.      Ground Four

In his fourth ground for relief, Hewitt argues the State failed to present sufficient evidence to support his conviction for murder under Ohio Rev. Code § 2903.02(A).  (Doc. No. 1at 7.)  He emphasizes the murder weapon was never found and argues the testimony from witnesses E.F. and L.M. was "incomplete, inconsistent, and contradictory and certainly not sufficient to prove that Petitioner was the person guilty of shooting Johnson." (*Id*.)  Hewitt also asserts the State failed to show he "purposely" killed Johnson; i.e., that it was his "specific intention" to kill him.  (Doc. No. 6 at 7.)  He argues the evidence failed to establish Hewitt sought out Johnson on the night of the shooting, or in any way initiated the confrontation that led to Johnson's death.  (*Id*. at 12.)  Hewitt notes the physical evidence showed he (Hewitt) had "just received a physical beating," but that Johnson "showed no such signs."  (*Id*. at 13.)  He

44

maintains "if anything this begins to establish that Petitioner was most likely acting in self-defense in the shooting of Johnson." (*Id*. at 11.)  Hewitt asserts "while a specific claim of self-defense was not raised by Petitioner's defense counsel during trial, and Petitioner does not seek to introduce it as a claim here, it must be taken into consideration in determining whether Petitioner purposely caused the death of Johnson." (*Id*.)  In sum, Hewitt argues as follows: "[s]ufficient evidence was produced to establish that Petitioner was arguably guilty of *some offense*.  Consequently the jury felt compelled to find Petitioner guilty of murder (A) solely because that was the only 'some offense' available to find them. However in doing so they lost their way in concluding that there was sufficient evidence to find that he had purposely caused the death of Johnson." (*Id.* at 15.)

Respondent argues the state appellate court reasonably concluded that any rational trier of fact could have found the essential elements of murder with a firearms specification beyond a reasonable doubt.  (Doc. No. 5 at 36.)  She notes the state appellate court correctly relied on the fact that Hewitt's cell phone and t-shirt were found at the scene, and his DNA was under the victim's fingernails.  (*Id.*)  Respondent further emphasizes the state appellate court's findings that Hewitt apparently felt threatened after the criminal damaging incident, as he "laid low at his father's house and kept 'heat' with him." (*Id*. at 37.)

The record reflects Hewitt raised this claim on direct appeal to both the state appellate court and the Supreme Court of Ohio.  (Doc. No. 5-1 at Exhs. 15, 21.)  The state appellate court considered this claim on the merits and rejected it as follows:

> {¶ 75} In his fourth assignment of error, appellant argues his conviction upon one count of murder is against the manifest weight of the evidence and is not supported by sufficient evidence. We disagree.

{¶ 76} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997–Ohio–52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held,  "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶ 77} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins, supra*, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 78} Appellant points to a number of inconsistencies and gaps in the evidence. With regard to the believability of appellee's witnesses, it is axiomatic that both the weight of the evidence and the credibility of the witnesses are determined by the trier of fact.  *State v. Yarbrough*, 95 Ohio St.3d 227, 231, 2002–Ohio–2126, 767 N.E.2d 216, ¶ 79.

{¶ 79} As we have addressed in our discussion of appellant's first and second assignments of error, appellant admitted he was present at the scene.  The jury could reasonably find that he was also the shooter based upon the timing of events: the 911 call indicates two men were fighting, one man shot the other, and police were on the scene very quickly.  They found appellant's cell phone and his t-shirt left behind. Appellant's D.N.A. was under the victim's fingernails, sufficient evidence to allow the jury to conclude appellant fought with the victim and shot him.  Also relevant is the sense of threat appellant obviously felt, evidenced by his decision to lay low at his father's house for a few days and to keep his "heat" with him.

{¶ 80} We acknowledge there are questions not answered by the evidence, but this does not render the jury's verdict against the manifest weight or sufficiency of the

evidence. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Burden*, 5th Dist. Stark No.2011–CR–1447, 2013–Ohio–1628, ¶ 80, citing *State v. Craig*, 10th Dist. 99AP–739, 2000 WL 297252 (Mar 23, 2000).

{¶ 81} Upon viewing the evidence in a light most favorable to appellee, we conclude any rational trier of fact could have found the essential elements of murder with a firearms specification proven beyond a reasonable doubt. We also find the jury did not clearly lose its way and create such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered.

{¶ 82} Appellant's fourth assignment of error is overruled.

*State v. Hewitt*, 2015 WL 2194185 at *12-13.

The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be supported by proof beyond a reasonable doubt with respect to every fact necessary to constitute the offense charged.  *In re Winship*, 397 U.S. 358, 363–64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).  The standard for determining if a conviction is supported by sufficient evidence is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  In making such a determination, a district court may not substitute its own determination of guilt or innocence for that of the factfinder, nor may it weigh the credibility of witnesses.  *Id. See also Walker v. Engle*, 703 F.2d 959, 970 (6th Cir. 1983).  Moreover, federal courts are required to give deference to factual determinations made in state court and "[a]ny conflicting inferences arising from the record ... should be resolved in favor of the prosecution." *Heinish v. Tate*, 1993 WL 460782 at *3 (6th Cir. 1993) (citing *Walker*, 703 F.3d at 969–70*.) See also Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (the deference owed

47

to the trier of fact limits the nature of constitutional sufficiency review.)

Consistent with these principles, the Supreme Court has emphasized that habeas courts must review sufficiency of the evidence claims with "double deference:"

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference.  First, on direct appeal, 'it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.'  *Cavazos v. Smith*, 565 U.S. 1, ——, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011) (*per curiam*).  And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.' "  *Ibid.* (quoting *Renico v. Lett*, 559 U.S. 766, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 132 S.Ct. 2060, 2062, 182 L.Ed.2d 978 (2012).  Under this standard, "we cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt," nor can "[w]e ... inquire whether any rational trier of fact would conclude that petitioner ... is guilty of the offenses with which he is charged."  *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).  Rather, a habeas court must confine its review to determining whether the state court "was unreasonable in its conclusion that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial."  *Id.* (emphasis in original) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009)).

Upon careful review of the trial transcript, the Court finds the state appellate court reasonably determined Hewitt's convictions were supported by sufficient evidence.  In resolving this claim, the state appellate court accurately summarized the evidence of record and correctly identified the applicable law.  As noted in the state appellate court opinion, viewed as a whole,

the physical evidence and eyewitness testimony placed Hewitt at the scene just moments before the fatal shooting.  L.M. testified she witnessed two men fighting on the corner.  (Doc. No. 9-5 at Tr. 424.)  One of the men was black while the other was lighter skinned.  (*Id*. at Tr. 424-425.)  The fight began on the corner, moved into the middle of the mosque parking lot, and then moved under a tree.  (*Id*.)  L.M. was concerned because it looked "really bad," so she called 911 for help.  (*Id*.)  Once the men were under the tree, they stopped fighting and were "just standing there talking."  (*Id*.)  L.M. testified the lighter skinned man then lifted his shirt up and tried to get a gun out of his pants.  (*Id*. Tr. 425-426.)  L.M. laid on the kitchen floor.  (*Id*.)  She heard a shot.  (*Id*. at Tr. 426-427.)  A few seconds later, after she had moved to the bathroom, L.M. heard a second shot.  (*Id.* at Tr. 425-427.)  She looked out the window and saw the black man lying under the tree.  (Tr. 426.)  L.M. indicated there were no other individuals present during the altercation.  (*Id*. at Tr. 431.)

The State also presented the testimony of E.F, who lived just across from the mosque parking lot where the shooting occurred.  E.F. testified he was on his front porch when he heard two loud sounds, which he thought might have been firecrackers.  (Doc. No. 9-5 at Tr. 465-466.)  He walked down his steps to the front yard to investigate and saw a young man running from the direction of the loud noises.  (*Id*. at Tr. 465-466.)  E.F. stated the man had light skin and dark brown hair with a scraggly beard.  (*Id*. at Tr. 467, 473-474.)  The man was running "really fast" and looked like he was carrying something in his left hand.  (*Id*. at Tr. 467-469.)  Later, after the police arrived and were processing the scene, E.F. saw what he believed to be the same young man return to the scene several times.  (*Id*. at Tr. 471-475.)  E.F. stated this man went into the bushes behind the building and came out riding a "rugged looking," orange moped.  (*Id*. at Tr.

49

472-473.)  During trial, E.F. identified Hewitt as the young man he saw that night.  (*Id*. at Tr. 473-475.)

Police arrived within minutes of L.M.'s 911 call.  (Doc. No. 9-4 at Tr. 296.)  As the state appellate court correctly noted, police discovered Hewitt's cell phone laying in the parking lot, not far from Johnson's body.  (*Id.* at Tr. 300-303.)  *See also* Doc. No. 9-3 at Tr. 133-135, 151-152, 221-231.  Police also found Hewitt's t-shirt.  (*Id.*)  Forensic examiners testified Hewitt's DNA was found under Johnson's right fingernails.  (Doc. No. 9-3 at Tr. 247-253.)  The State also introduced evidence that Hewitt was arrested approximately five hours after the shooting and had redness and marks on his face, torso, and hand. (Doc. No. 9-4 at Tr. 308-310.)  Although the State did not recover the murder weapon (which they believed was a revolver), the State presented evidence Hewitt owned numerous weapons, including several revolvers, and knew how to use them.  (Doc. No. 9-3 at Tr. 143-148, 152-154, 162; Doc. No. 9-4 at Tr. 328-331, 354-355, 394-395.)  The State also presented evidence showing Hewitt owned a dirt bike matching the description of the moped that E.F. saw on the night of the shooting.  (Doc. No. 9-3 at Tr. 153; Doc. No. 9-4 at Tr. 345-346, 381-382.)

Finally, the State presented evidence regarding the criminal damaging incident involving Ms. Jackson's car and the tension it created between Hewitt and Johnson.  Specifically, the State presented several text messages from Hewitt's cell phone indicating he was staying at his father's house in part because the victim, Mr. Johnson, "wanted to talk shit no[w] they all saying they . . . getn some Chicago n—s on me."  (Doc. No. 9-3 at Tr. 158-160.)  In one of these messages, Hewitt states "I got somewhere to stay n I got my heat."  (*Id*. at Tr. 160-161.)

The state appellate court reasonably concluded that sufficient evidence supported the

50

jury's findings as to each element of murder and the attendant firearm specification.  As noted above, the State introduced evidence placing Hewitt at the scene immediately prior to and after the shooting.  The State also presented evidence indicating Hewitt felt threatened by Johnson to the point where he felt it necessary to carry a gun and, further, that Hewitt owned several guns (including at least one revolver) and knew how to use them.  Hewitt argues, and the Court acknowledges, that the evidence presented by the State was entirely circumstantial.  The Supreme Court has held, however, that "[c]ircumstantial evidence ... is intrinsically no different from testimonial evidence," and that it is sufficient as long as the jury is convinced beyond a reasonable doubt.  *See Holland v. United States*, 348 U.S. 121, 138-140, 75 S.Ct. 127, 99 L.Ed.2d 150 (1955).  *See also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) (stating that "we have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required").

Hewitt nonetheless asserts his conviction is not supported by sufficient evidence because the testimony of L.M. and E.F. is unreliable and contradictory.  (Doc. No. 1 at 7.)  This argument is without merit.  It is well established the credibility of witness testimony was outside the scope of the state appellate court's consideration of Hewitt's claim of insufficient evidence.  *See Martin*, 280 F.3d at 618.  Rather, the state appellate court properly considered all of the evidence in the light most favorable to the State and determined there was sufficient evidence to convict him.  The standard of review applied by the state appellate court coincides with the standard for sufficiency of the evidence set forth in *Jackson*, *supra*.  Hewitt points to no federal legal precedent requiring the state appellate court, in the context of a challenge to the sufficiency of

the evidence, to engage in the evidence-weighing that he requests.

Hewitt next argues, at length, that the jury "lost its way" because the State failed to show he "purposely" killed Johnson, as that term is defined by Ohio law.  (Doc. No. 6 at 7.)  He asserts "while a specific claim of self-defense was not raised by Petitioner's defense counsel during trial, and Petitioner does not seek to introduce it as a claim here, it must be taken into consideration in determining whether Petitioner purposely caused the death of Johnson." (*Id.* at 11.)

The Court disagrees.  The Ohio Revised Code defines the offense of felony murder as "purposely causing the death of" another.  *See* Ohio Rev. Code § 2903.02(A).  "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."  Ohio Rev. Code § 2901.22(A).  Under Ohio law, a person's intent to kill "may be presumed where the natural and probable consequence of a wrongful act is to produce death, and such intent may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound."  *State v. Robinson*, 161 Ohio St. 213, 118 N.E.2d 517, syllabus at ¶ 5 (1954).[11]  Moreover, a jury can reasonably infer a defendant "formed the specific intent to kill

---

[11] *See also State ex rel. Brust v. Mohr*, 2018 WL 1446116 at * 3 (Ohio App. 10th Dist. March 23, 2018) ("Purpose or intent can be established by circumstantial evidence, *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, and by the surrounding facts and circumstances in the case. *Lott, supra*. These circumstances include the means or weapon used, its tendency to destroy life if designed for that purpose, and the manner in which the wounds are inflicted. *State v. Robinson* (1954), 161 Ohio St. 213, 118 N.E.2d 517; *Busby, supra*. The specific intent to kill may be reasonably inferred from the fact that a firearm is an inherently

52

from the fact that a firearm is an inherently dangerous instrument, the use of which is likely to produce death, coupled with relevant circumstantial evidence."  *State v. Shue*, 97 Ohio App.3d 459, 468, 646 N.E.2d 1156 (Ohio App. 9th Dist. 1994) (citing *State v. Widner*, 69 Ohio St.2d 267, 270, 431 N.E.2d 1025 (1982)).  *See also Burrell v. Warden, London Correctional* Inst., 2018 WL 1792191 at * 11 (S.D. Ohio April 16, 2018); *Glenn v. Kelly*, 2013 WL 5563765 at * 9 (N.D. Ohio Oct. 8, 2013); *Crawford v. Warden, Warren Corr. Inst.*, 2011 WL 5307408, at *15 (S.D. Ohio Sept. 29, 2011).

A rational trier of fact viewing the evidence in the light most favorable to the State could have found beyond a reasonable doubt that Hewitt purposely caused the death of William Johnson and it was not objectively unreasonable for the state appellate court to so conclude.  The State presented evidence there was tension between Hewitt and Johnson relating to the incident involving Ms. Jackson's car.  Hewitt owned and/or had access to numerous firearms, including several revolvers, and stated he was carrying a gun (i.e., "got my heat") as a result of Johnson's threats.  As discussed above, the jury could reasonably conclude from the physical evidence and eyewitness testimony that Hewitt fought with Johnson in the parking lot, drew a weapon from his pants, and shot Johnson twice.  The coroner testified that one of the two shots was to Johnson's face and at point blank range (i.e., from between 2 ½ and 4 inches away).  (Doc. No.

---

dangerous instrument, the use of which is likely to produce death."); *State v. Jones*, 2017 WL 5565501 at * 8 (Ohio App. 5th Dist. Nov. 17, 2017) (Under Ohio law, the trier of fact may infer an intention to kill from the surrounding circumstances where the natural and probable consequence of a defendant's actions is to produce death. *See State v. Turner*, 10th Dist. Franklin No. 97APA05–709, 1997 WL 798770, citing *State v. Robinson* (1954), 161 Ohio St. 213, 118 N.E.2d 517, paragraph five of the syllabus. Furthermore, "[t]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence." *State v. Brown*, 8th Dist. Cuyahoga No. 68761, 1996 WL 86627").

9-3 at Tr. 270-275.)

As noted *supra*, Ohio courts have found that "[t]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence."  *Glenn*, 2013 WL 5563765 at * 9 (citing *State v. Collins*, 2005 WL 774010 at * 5 (Ohio App. 5th Dist. 2005)).  *See also State ex rel. Brust v. Mohr*, 2018 WL 1446116 at * 3; *State v. Jones*, 2017 WL 5565501 at * 8.  Viewing the evidence in the light most favorable to the State, a rational fact finder could have concluded this evidence established the purpose element of murder under Ohio law.  The evidence showing Hewitt fired a loaded gun at close range at Johnson's head could reasonably support a finding of guilt beyond a reasonable doubt and the state appellate court adjudication was not "objectively unreasonable."  *See Williams*, 529 U.S. at 409–11; *Jackson*, 443 U.S. at 318.

Hewitt nonetheless suggests his conviction is not supported by sufficient evidence because the jury should have concluded instead that he was acting in self-defense.  This argument is without merit.  "The *Jackson* standard does not require the Warden to rule out every hypothesis except that of guilt beyond a reasonable doubt."  *Gipson v. Sheldon*, 659 Fed. Appx. 871, 881 (6th Cir. Sept. 14, 2016) (citing *Jackson*, 443 U.S. at 326.)  Rather, "*Jackson* says that evidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Cavazos v. Smith*, 565 U.S. 1, 7, 132 S.Ct. 2,  181 L.Ed.2d 311 (2011) (quoting *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781) (emphasis in original).  "It also unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not

affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *Id.* (quoting *Jackson*, 443 U.S. at 326, 99 S.Ct. 2781).  In light of the above, and given the deference to state court decisions required by § 2254(d), the Court cannot find the state appellate court's decision is objectively unreasonable.

Accordingly, the Court finds Hewitt has not shown insufficient evidence supported his conviction for murder and the associated firearm specification.  It is therefore recommended Hewitt's fourth ground for relief be denied.

### V. Conclusion

For all the reasons set forth above, it is recommended the Petition be DENIED.

Date:   July 2, 2018                                                    *s/ Jonathan Greenberg*
                                                                         Jonathan D. Greenberg
                                                                         United States Magistrate Judge

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**